## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **VT HALTER MARINE, INC.** | § | **PLAINTIFF** |
| | § | |
| **V.** | § | **Civil No. 1:11CV250-HSO-RHW** |
| | § | |
| **WARTSILA NORTH AMERICA, INC.** | § | **DEFENDANT** |

### MEMORANDUM OPINION AND ORDER GRANTING IN PART
### AS UNOPPOSED AND DENYING IN PART
### DEFENDANT'S RENEWED MOTION TO COMPEL
### ARBITRATION, AND STAYING CASE PENDING ARBITRATION

This matter comes before the Court upon the Renewed Motion to Compel

Arbitration [37] filed by Defendant Wartsila North America, Inc.  Plaintiff VT Halter

Marine, Inc., has filed a Response [41], and Defendant a Reply [44].  The Court,

having considered the record, the pleadings on file, the briefs and arguments of the

parties, and relevant legal authorities, finds that Defendant's Renewed Motion to

Compel Arbitration should be granted in part as unopposed to the extent it seeks to

compel arbitration of the breach of warranty claim and denied in part to the extent it

seeks to compel arbitration on the tortious interference with contract claim.  This

matter will be stayed pending completion of arbitration on the warranty claim.

### I. FACTS AND PROCEDURAL HISTORY

Pursuant to a Vessel Construction Contract [the "Construction Contract"]

dated August 29, 2006, between Vessel Management Services, Inc. ["Vessel

Management"] and Plaintiff VT Halter Marine, Inc. ["VTHM" or "Plaintiff"], VTHM

undertook to build several vessels, including the *M/V Pride*.  The Construction

Contract provided that Vessel Management would supply VTHM with certain

components for the vessels.  On October 23, 2007, Vessel Management entered into a separate contract with Defendant Wartsila North America, Inc. ["Wartsila" or "Defendant"], for the purchase of propulsion systems for the vessels [the "Sales Contract"].  The Sales Contract between Vessel Management and Wartsila contained a mandatory arbitration clause which stated that

> [t]his Agreement shall be construed in accordance with the laws of the State of New York, without reference to its conflict of laws provisions. Any dispute between the parties arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the American Arbitration Association by one or more arbitrators appointed in accordance with the said rules, in New York, New York.

Sales Contract [37-2] at 8.[1]

VTHM claims that after a propulsion system installed on the *Pride* began experiencing problems, Wartsila misrepresented to Vessel Management that VTHM's improper flushing of the hydraulic system caused the problems.  As a result, Vessel Management demanded VTHM pay for a new propulsion system, which it did. VTHM maintains that the propulsion system problem aboard the *Pride* was in fact the result of a "defect created during the manufacturing process, in particular, when the hub was mounted onto the shaft at Wartsila's facility."  Am. Compl. [25] at 4.

VTHM filed a Complaint [1] initiating this litigation on June 24, 2011, and a First Amended Complaint [25] on December 7, 2011.  The First Amended Complaint names Wartsila as the sole Defendant and asserts tortious interference with contractual relations and breach of warranty claims.  Am. Comp. [25] at 8–9.  On

---

[1]In order to avoid confusion, the Court will reference its own CM/ECF generated page numbers in citing to the record for exhibits.

October 3, 2011, Wartsila filed a Motion to Compel Arbitration [10].  VTHM conceded that Wartsila was entitled to arbitrate the warranty claims, Pl.'s Mem. [18], at 5, and stated that it did "not oppose the motion to stay the warranty claim pending arbitration," *id.*, at 1.  The parties disputed, however, whether VTHM was required to arbitrate its tortious interference with contract claim.  The Court answered this question in the affirmative, granted the Motion to Compel [10], and dismissed the matter in favor of arbitration.  Order [26] at 1–3; J. [27] at 1.  VTHM appealed [28], and the United States Court of Appeals for the Fifth Circuit reversed and remanded the matter to this Court "for further determination of whether equitable estoppel compels arbitration."  *VT Halter Marine, Inc. v. Wartsila North America, Inc.*, 511 F. App'x 358, 362 (5th Cir. 2013); Op. [31] at 7.  Upon remand, Wartsila filed the present Renewed Motion [37] to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4.

Wartsila relies upon the arbitration provision in the Sales Contract to support its position.  Sales Contract [37-2], at 8.  Vessel Management and Wartsila are signatories to that agreement; VTHM is not.  Wartsila, as a signatory, seeks to compel VTHM, as a non-signatory, to arbitrate based upon the theory of "direct benefits estoppel."  There is no dispute that the Sales Contract contained a valid and enforceable arbitration clause.  The only question is whether VTHM is bound by that clause to arbitrate its tortious interference with contract claim against Wartsila. The Fifth Circuit's mandate directs the Court to determine whether equitable estoppel compels arbitration by VTHM as a non-signatory under the facts

presented.[2]

## II.  DISCUSSION

A.    Wartsila's Request for Oral Argument

"Wartsila respectfully requests the opportunity to present oral argument at a hearing upon its Renewed Motion as soon as is practicable for the Court."  Def.'s Mot. [37], at p. 2.  The Court, in its discretion, does not find that oral argument would be necessary or helpful in resolving this Motion.  Pursuant to L.U. Civ. R. 7(b)(6)(A), the Court shall decide Wartsila's Renewed Motion without a hearing or oral argument.

B.    Whether a Conflict of Law Exists

The parties have not addressed whether state or federal law applies when determining the extent to which a non-signatory may be bound by an arbitration provision.[3]  The Fifth Circuit has noted that the answer to this precise question is uncertain, as that Court has recognized that it has issued some opinions applying state law and others applying federal law.  *Graves v. BP America, Inc.*, 568 F.3d 221, 223 (5th Cir. 2009) (collecting cases).  If state law applies, the parties have not addressed whether Mississippi or New York law would control.  The forum state is Mississippi, but the Sales Contract, in the same paragraph as the arbitration clause, provides that it "shall be construed in accordance with the laws of the State of New

---

[2]The Construction Contract between VTHM and Vessel Management also contains an arbitration provision.  Construction Contract [36-1] at 32.  Wartsila has not sought to compel arbitration based upon this provision.

[3]Wartsila cites both federal and Mississippi caselaw in its Memorandum [38] and Reply [44], while VTHM references only federal precedent in its Response [41].

York, without reference to its conflict of laws provisions." Sales Contract [37-2] at 8.

The Court need not resolve the conflict of laws issue, as there is no reason to believe that Mississippi or New York law would compel a different result in this case. *See, e.g., Covington v. Aban Offshore Ltd.*, 650 F.3d 556, 558–59 (5th Cir. 2011); *Graves*, 568 F.3d at 223. The question presented is the applicability of direct benefits estoppel, and federal law as well as Mississippi and New York state law appear to "dovetail to provide the same outcome." *Graves*, 568 F.3d at 223; *see also, e.g., Scruggs v. Wyatt*, 60 So. 3d 758, 767–71 (Miss. 2011) (citing Fifth Circuit case law and applying direct benefits estoppel theory to bind non-signatory to arbitrate claims); *HRH Const. LLC v. Metro. Transp. Auth.*, 823 N.Y.S.2d 140, 141 (N.Y. App. Div. 2006) ("A non-signatory to an agreement containing an arbitration clause that has knowingly received direct benefits under the agreement will be equitably estopped from avoiding the agreement's obligation to arbitrate." (citing *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001))).

## C.   The Doctrine of Direct Benefits Estoppel

"Arbitration is a matter of contract between the parties, and a court cannot compel a party to arbitrate a dispute unless the court determines the parties agreed to arbitrate the dispute in question." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998) (citations omitted). "In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345

F.3d 347, 353 (5th Cir. 2003). The Fifth Circuit has stated that "[s]ix theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary." *Id.* at 356. "The use of equitable estoppel is within a district court's discretion." *Id.* 3d at 360 (citations omitted). Based upon Wartsila's arguments and the Fifth Circuit's mandate, estoppel is the only theory at issue here.

Wartsila relies on the specific theory of direct benefits estoppel, which "involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) (alteration in original) (quotation omitted). The Fifth Circuit has held that "[a] non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.* (citation omitted). Wartsila argues that both theories operate to estop VTHM from repudiating the arbitration clause in the Sales Contract. Def.'s Mem. Br. [38] at 9–21.

Under the first method, "[c]ourts have applied direct benefits estoppel to bind a non-signatory to an arbitration agreement when the non-signatory knowingly exploits the contract containing the arbitration clause and obtains a direct benefit

6

from the contract." *Noble Drilling Servs.,* 620 F.3d at 473.  As for the second

method, the Fifth Circuit has held that "the doctrine of direct benefits estoppel also

applies when a non-signatory sues to enforce certain terms in a contract containing

an arbitration clause . . . or brings claims that can only be determined by reference to

an agreement containing an arbitration clause." *Id.* at 474 (citations omitted).

Because VTHM does not seek to enforce a specific term in the Sales Contract,

whether the second method applies turns on whether VTHM's tortious interference

claim can only be decided by reference to the Sales Contract containing the

arbitration clause.  *See id.*; *see also* Def.'s Mem. Br. [38] at 16–21.

D.    Analysis of the Parties' Arguments

1.    First Method for Application of Direct Benefits Estoppel

Whether direct benefits estoppel controls under the first approach turns on

whether VTHM knowingly exploited the Sales Contract and obtained a direct benefit

from it.  *See Noble Drilling Servs.,* 620 F.3d at 473.

a.    Whether VTHM Knowingly Exploited the Sales Contract

In order to satisfy the knowledge requirement, "the non-signatory must have

had actual knowledge of the contract containing the arbitration clause." *Id.* (citation

omitted).  In *Noble Drilling Services*, the plaintiff Noble Drilling had approached the

defendants Bridon and Certex about the possibility of purchasing wire ropes from

Bridon.  *Id.* at 471.  Certex was Bridon's distributor under a distribution agreement

which included an arbitration provision.  *Id.*  Noble Drilling entered into a sales

contract with Certex to purchase the ropes.  The sales contract apparently did not

contain an arbitration clause.  *Id.*  To fill Noble's order, Certex entered into purchase

order agreements with Bridon which specified the type of rope Noble was seeking

and directed Bridon to make shipments directly to Noble.  *Id.*  The purchase order

agreements contained an arbitration provision.  Both Bridon and Certex allegedly

made certain representations about the ropes to Noble.  After the ropes purportedly

failed during a hurricane, Noble claimed these representations were false.  *Id.* at

471–72.  Noble brought suit against both Bridon and Certex, charging that Certex

had breached the sales contract, that Bridon had negligently designed the ropes, and

that both defendants essentially breached express and implied warranties and

engaged in fraud in delivering ropes which were not of the quality and capacity

represented.  *Id.* at 472.  Bridon and Certex moved to compel Noble to arbitrate its

claims based upon the arbitration clause contained in the purchase order

agreements and the distribution agreement between Bridon and Certex, even though

Noble was not a party to any of those contracts.  *Id.*

    The district court concluded that Noble was bound to arbitrate under the

theory of direct benefits estoppel because it had received a direct benefit from and

had filed a suit premised on the purchase order agreements.  Noble appealed.  The

Fifth Circuit reversed, holding that "[b]ecause no evidence supports a conclusion that

Noble knew of the terms of the Purchase Order Agreements, Noble could not have

the knowledge necessary to support the 'knowingly exploited' theory of direct

benefits estoppel."  *Id.* at 474.  The Court of Appeals further noted that "Noble could

not have had knowledge of the Purchase Order Agreement when it ordered the ropes

from Certex because the Purchase Order Agreements were not created until after Noble ordered the ropes." *Id.* at n.5.

In this case, VTHM has filed a Stipulation of Fact [36] that, at the time it entered into the Construction Contract with Vessel Management on August 29, 2006, "VTHM knew that defendant Wartsila North America Inc. was furnishing the main engines, shaft/hub assemblies and blades." Stip. [36] at 1. However, there is insufficient evidence that VTHM knew the details of the Sales Contract itself or of the existence of the relevant arbitration provision at the time it entered into the Construction Contract with Vessel Management. Moreover, as in *Noble Drilling Services*, VTHM could not have known the particulars of the Sales Contract when it entered into the Construction Contract on August 28, 2006, because the Sales Contract was not executed until over one year later on October 23, 2007. Construction Contract [36-1] at 32; Sales Contract [37-2] at 5. The record does not support the conclusion that VTHM had the knowledge necessary to support the "knowingly exploited" theory of direct benefits estoppel. *See Noble Drilling Servs.,* 620 F.3d at 474.

In its Reply [44], Wartsila argues that VTHM was aware by August 2006 that it was Wartsila's practice to include an arbitration clause in agreements for the sale of its equipment because VTHM and Wartsila had entered into an earlier agreement in December 2004 for the sale of equipment. During negotiations, Wartsila required the insertion of an arbitration clause very similar to the one in the Sales Contract. Def.'s Reply [44] at 5. Wartsila has not cited the Court to any persuasive authority

holding that a non-signatory's knowledge of a signatory's previous use of an arbitration provision constitutes sufficient knowledge for the application of direct benefits estoppel.

      b.    Whether VTHM Obtained a Direct Benefit from the Sales Contract

Even assuming that VTHM knowingly exploited the Sales Contract, the record does not support the conclusion that VTHM benefitted directly from the Sales Contract.  Wartsila's attempt to compel arbitration under the first method cannot succeed for this reason as well.  *See Noble Drilling Servs.,* 620 F.3d at 473.  There does not appear to be any binding Fifth Circuit authority which addresses what constitutes a sufficiently direct benefit to justify estopping a non-signatory from avoiding arbitration.  The Court does find persuasive the following cases from other circuits.

In *Zurich American Insurance Co. v. Watts Industries, Inc.*, 417 F.3d 682 (7th Cir. 2005), the Seventh Circuit considered whether certain benefits to James Jones Company ["Jones"] were direct or indirect such that Zurich American Insurance Company ["Zurich"] could compel Jones to arbitrate under a direct benefits estoppel theory.  Zurich issued primary liability insurance policies to Watts Industries, Inc. ["Watts"] and Jones, its wholly owned subsidiary.  *Id.* at 684.  The insurance policies did not contain arbitration provisions, but Watts entered into separate deductible agreements with Zurich which each contained a broad arbitration clause.  *Id.*  When Jones and Watts were both sued, Zurich denied it owed a duty to defend and indemnify either.

10

Watts and Jones filed separate breach of contract and bad faith lawsuits against Zurich in state court, which were consolidated.  *Id.* at 685.  Zurich sought to compel arbitration with both Watts and Jones by filing a petition to compel in federal court and asking the state court to stay the consolidated actions.  *Id.*  Before the Seventh Circuit was the district court's order which exempted Jones from arbitration but compelled Watts to arbitrate two issues.  *Id.* at 686.  Of relevance here is Zurich's argument that Jones should be estopped from avoiding arbitration, even though it was not a signatory to the deductible agreements which contained the arbitration provisions.  *Id.* at 687.  The Seventh Circuit considered whether Jones had received any direct benefits under the deductible agreements and concluded that "[e]ven assuming that Jones has benefitted from the deductible agreements by paying lower insurance premiums based on the deductibles, this benefit is too attenuated and indirect to force arbitration under an estoppel theory."  *Id.* at 688.

In *American Bureau of Shipping v. Tencara Shipyard S.P.A.*,  170 F.3d 349 (2d Cir. 1999), the United States Court of Appeals for the Second Circuit employed direct benefits estoppel to require non-signatory vessel owners to arbitrate.  The owners had entered into a construction contract with Tencara to construct a racing yacht.  The agreement provided that the owners would be solely responsible for registering the vessel under the French flag and that the ship would be "classed" according to the standards and norms permitting approval of the American Bureau of Shipping ["ABS"], one of the world's leading classification societies.  *Id.* at 351. This would result in less expensive insurance costs for the owners and would permit

11

the craft to sail under the French flag.  To obtain an ABS classification for the vessel,
Tencara entered into a contract referred to as the Request for Class Agreement with
ABS.  This contract contained an arbitration clause.  The owners were provided a
copy of the contract.  *Id.*

After the yacht was completed and delivered to the owners, ABS delivered an
Interim Certificate of Classification ["ICC"] to Tencara, which in turn gave it to the
owners.  The ICC explicitly incorporated the terms and conditions of the Request for
Class Agreement, including the arbitration provision.  *Id.*  The owners also obtained
insurance coverage premised upon the existence of a valid classification.  *Id.*  After
the vessel suffered hull damage apparently due to defective design and poor
construction, the owners, Tencara, and the owners' underwriters filed claims against
ABS.  ABS brought an action to compel arbitration.  Of relevance here is ABS's
attempt to compel the owners, as non-signatories, to arbitrate.

The Second Circuit found that the owners had received direct benefits from
the ICC, which incorporated the Request for Class Agreement's arbitration
agreement by reference.  The Second Circuit determined that these benefits flowed
directly from the ICC and included that the owners were able to insure the vessel
more cheaply and to sail under a French flag.  *Id.* at 353.  "Without the ICC,
registration would have been practically impossible.  The Owners are hence required
to arbitrate their claims against ABS."  *Id.*

At issue in *Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d
773 (2d Cir. 1995), was a working agreement where E&S agreed to supply its

12

imaging equipment only to Rediffusion.  Rediffusion was in the business of building flight simulators and agreed to purchase imaging equipment exclusively from E&S. *Id*. at 775.  The working agreement included an arbitration provision.  After Thomson, which also built flight simulation equipment, purchased Rediffusion a dispute arose regarding whether Thomson was bound by the working agreement.  *Id*. The working agreement defined Rediffusion as "Rediffusion and each of its affiliates."  *Id*.  Thomson initiated an action in federal court seeking a declaration that it was not bound by the arbitration provision in the working agreement, and E&S filed a cross-motion to compel arbitration.  *Id*. at 776.  The district court determined that Thomson was required to arbitrate, and Thomson appealed.

E&S argued that Thomson directly benefitted from the working agreement by being able to exclude E&S, along with all simulators utilizing E&S imaging equipment, from the market, effectively eliminating E&S as a competitor.  *Id*. at 779. The Second Circuit found this constituted an indirect benefit and "not the sort of benefit which [that] Court envisioned as the basis for estopping a nonsignatory from avoiding arbitrating."  *Id*.  This was because any benefit was derived from Thomson's purchase of Rediffusion and not from the working agreement itself.  *Id*.  Had Thomson sought to acquire imaging equipment from E&S or to enforce the exclusivity provisions in the agreement, Thomson would have received a direct benefit and would have then been estopped from avoiding arbitration.  *Id*.

In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993), the arbitration clause at issue was contained in an agreement which

settled certain litigation regarding use of the name "Deloitte."  The plaintiff was a member firm of an international association known as Deloitte Haskins & Sells International ("DHSI"), the entity that had signed the settlement agreement on behalf of its member firms.  *Id.* at 1061.  The gravamen of the plaintiff's suit was that it claimed the right to use the name "Deloitte," and the issue on appeal was whether the plaintiff had to submit that claim to arbitration.  *Id.*  The Second Circuit determined that the plaintiff was bound by the arbitration provision in the settlement agreement because the plaintiff had failed to object to the settlement agreement when it received it and had knowingly accepted the benefits of the agreement by continuing to use the name "Deloitte."  *Id.* at 1064.

Turning to the facts of this case, Wartsila maintains that the Sales Contract was "part of a three party/two contract transaction that was necessary for VTHM to complete its business with Vessel Management."  Def.'s Mem. Br. [38] at 3.  Wartsila contends that VTHM received direct benefits from the Sales Contract including:  (1) the Sales Contract saved VTHM from being required to buy the engines and propulsion system directly from Wartsila in order to supply a working tugboat, *id.* at 15; (2) the Sales Contract provided for Wartsila's supervision of VTHM's installation of the parts at issue, while the Construction Contract required VTHM to install the parts in a good and workmanlike manner, *id.*; (3) pursuant to the Sales Contract, Wartsila technicians were present during VTHM's "dock trials" and "sea trials," *id.*; and (4) VTHM would have been unable to deliver working tugs without the equipment provided by Wartsila, *id.* at 16.

14

As for the first purported benefit, the Court is not persuaded that VTHM in fact received a direct benefit because the Sales Contract saved it from having to purchase the propulsion systems directly from Wartsila. As in *Thomson-CSF*, any such benefit to VTHM derived from the Construction Contract. *Thomson-CSF*, 64 F.3d at 779. The Construction Contract was drafted over a year before the Sales Contract and provided that Vessel Management was responsible for supplying the various components of the vessels, including the propulsion systems. Construction Contract [36-1] at 11–12; Def.'s Mem. Br. [38] at 5; Am. Compl. [25] at 2. The Sales Contract therefore did not confer a direct benefit upon VTHM in this way.

The party benefitting from the Sales Contract was Vessel Management, not VTHM. The record reflects that Vessel Management, as the tug owner, was acting in its own financial interest by entering into the Sales Contract with Wartsila. There is no evidence that either Vessel Management or Wartsila acted for VTHM's benefit by entering into the Sales Contract. Nor is there evidence that Vessel Management was acting on VTHM's behalf as in *Deloitte Noraudit*. Even if the purchase of equipment from Wartsila could somehow be viewed as a benefit to VTHM, this argument is similar to that presented to the Seventh Circuit in *Zurich American*, and any such benefit was too attenuated to justify compelling VTHM to arbitrate.

Wartsila's second theory is that the Sales Contract's provision for Wartsila to supervise VTHM's installation of the parts and to provide technicians to be present during VTHM's "dock trials" and "sea trials" constituted direct benefits to VTHM

15

because the Construction Contract required VTHM to install the parts in a good and workmanlike manner.  Def.'s Mem. Br. [38] at 15.  The Court is not persuaded that the mere presence of and supervision by Wartsila employees under the Sales Contract directly benefitted VTHM.  Moreover, the parties have not directed the Court to a specific provision in the Sales Contract that required such an undertaking by Wartsila.  The provisions upon which Wartsila may be relying appear in sections 1.13.1 and 2.9 of the Technical Specifications of the purchase orders.  Technical Specifications [37-2] at 47–48, 60.[4]

Section 1.13.1 provides for "[s]upport for pre-commissioning and commissioning of the installation and participation in sea trials including travelling [sic] and lodging costs."  *Id.* at 47.  Section 2.9 provides for "[s]upport for commissioning of the installation and participation in sea trials . . . ."  *Id.*  A plain reading of these sections indicates that Wartsila's presence at the pre-commissioning and commissioning inured to the benefit of Vessel Management, not VTHM.  In addition, section 2.9 anticipates that the commissioning support would occur at "Yard Crowley."[5]  Technical Specifications [37-2] at 60.  The *M/V Pride* was

---

[4] The Sales Contract provides that the New Purchase Orders must be performed in accordance with the Technical Specifications.  Sales Contract [37-2], at 6.  The Technical Specifications are referenced in the Sales Contract, though not specifically incorporated into it.  *Id.*

[5] It is not clear from the record to what "Yard Crowley" refers, but it does not appear to be VTHM's shipyard.  Technical Specifications [37-2] at 60.  Vessel Management is apparently a wholly owed subsidiary of Crowley Maritime Corporation.  *Manitowoc Marine Group, LLC v. Ameron Intern. Corp.*, 424 F. Supp. 2d 1119 (E.D. Wis. 2006), *vacated in part on other grounds by, Manitowoc Marine Group, LLC v. Ameron Intern. Corp.*, No. 03-C-0232, 2006 WL 1799821 (E.D. Wis. June 28, 2006); *see also, e.g.*, Sales Contract [37-2] at 9 (providing notices pursuant to the agreement are to be provided to Edward Schlueter of "Vessel Management Services, Inc. C/O Crowley Maritime Corporation" in Jacksonville,

apparently built at VTHM's Moss Point, Mississippi, shipyard.  Am. Compl. [25] at 2.
It seems clear that the parties to the Sales Contract did not contemplate a benefit to
VTHM under this provision, nor did VTHM receive one.  Even if this constituted a
benefit, the Court again finds that it was not a direct benefit, and any such benefit
VTHM received was too attenuated to estop VTHM from avoiding arbitration.

Finally, Wartsila argues that VTHM received a direct benefit under the Sales
Contract because VTHM would have been unable to deliver working tugs without
Wartsila's equipment.  Def.'s Mem. Br. [38] at 16.  The parties do not dispute that
Vessel Management, as the party to the Construction Contract, was responsible for
supplying the equipment manufactured by Wartsila.  Construction Contract [36-1] at
11–12; Def.'s Mem. Br. [38] at 5; Am. Compl. [25] at 2.  This was not VTHM's
responsibility.  Regardless of the existence of the Sales Contract between Vessel
Management and Wartsila, Vessel Management was still required by the
Construction Contract to provide the needed equipment for the tugs.  The Court is
not persuaded that by providing equipment under its Sales Contract with Vessel
Management, Wartsila conferred a benefit upon VTHM.  Even if it did, any such
benefit was not sufficiently direct to require VTHM to arbitrate.

In summary, VTHM did not knowingly exploit the Sales Contract or obtain
any direct benefits from it.  Accordingly, the first method by which a non-signatory
can "embrace" a contract containing an arbitration clause does not apply under the
facts of this case.  VTHM cannot be compelled to arbitrate its tortious interference

---

Florida).  Therefore, the provision specifying "Yard Crowley" does not seem to anticipate
work at VTHM's Mississippi facility.

claim against Wartsila under this approach.

    2.    <u>Second Method for Application of Direct Benefits Estoppel</u>

Because VTHM does not seek to enforce a specific term in the Sales Contract, the Court next considers whether VTHM's tortious interference claim can only be determined by reference to the Sales Contract.  *See Noble Drilling Servs.*, 620 F.3d at 474.  Wartsila maintains that it cannot.  Def.'s Mem. Br. [38] at 16.  VTHM counters that it is not seeking to enforce the Sales Contract and its claim can be decided "without substantive reference to that contract."  Pl.'s Resp. [41] at 13.

In *Noble Drilling Services*, Noble contended that its claims for misrepresentation and warranty were based either on pre-purchase representations by Bridon and Certex or on obligations imposed by law.  *Noble Drilling Servs.,* 620 F.3d at 474.  The Fifth Circuit held that "[a]s plaintiff, Noble is not required to base its claims on the Purchase Order Agreements and can, as it has, disclaim any reliance thereupon."  *Id.*  Because the success of Noble's claims depended upon the pre-purchase representations and whatever duties a manufacturer and distributor owed by law, the Fifth Circuit concluded that the theory of direct benefits estoppel did not obligate Noble to arbitrate.  *Id.* at 475.

With respect to this case, after a plaintiff proves that an enforceable obligation exists between it and another party, the plaintiff may show tortious interference with a contract by demonstrating:  (1) that defendant's acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiff in his lawful business; (3) that they were done with the unlawful purpose of causing damage and

18

loss, without right or justifiable cause on the part of the defendant, which constitutes malice; and (4) that actual damage and loss resulted.  *Coleman & Coleman Enters., Inc. v. Waller Funeral Home*, 106 So. 3d 309, 315–16 (Miss. 2012)  (citations omitted).  In addition, the plaintiff must prove that the contract would have been performed but for the alleged interference.  *Id.* at 316.

To prove its tortious interference claim, VTHM will be required to demonstrate that:  (1) the Construction Contract was an enforceable obligation which existed between it and Vessel Management; (2) Wartsila's acts were intentional and willful; (3) they were calculated to cause damage to VTHM in its lawful business; (4) they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the Wartsila; (5) actual damage and loss resulted; and (6) the Construction Contract would have been performed but for the alleged interference.  *See* Am. Compl. [25] at 8; *see also Coleman & Coleman Enters.*, 106 So. 3d at 315–16.

VTHM claims that Wartsila tortiously interfered with the Construction Contract, not the Sales Contract containing the arbitration provision.  VTHM asserts that Wartsila falsely represented to Vessel Management that VTHM's actions were the cause of the propulsion system problems and that Wartsila's unlawful purpose was to directly benefit itself by having VTHM purchase the replacement parts, thereby causing damage to VTHM.  Am. Compl. [25] at 8.  None of these essential elements of VTHM's tortious interference claim require reference to the Sales Contract.  While the Sales Contract will likely be referenced at trial to supply

19

background facts and understand the parties' relationships, the Court is not persuaded that VTHM's tortious interference with its Construction Contract claim can only be determined by reference to the Sales Contract. VTHM is not required to base its claims on the Sales Contract, and it has not done so. Accordingly, the Court finds that the theory of direct benefits estoppel does not operate to require VTHM to arbitrate its tortious interference with contract claim. *See Noble Drilling Servs.,* 620 F.3d at 474–75.

E.   VTHM's Breach of Warranty Claim

VTHM's remaining claim against Wartsila is for breach of warranty. Am. Compl. [25] at 8–9. The warranty referenced in the First Amended Complaint is one contained in the Sales Contract. *Id.* In briefing the original Motion to Compel, VTHM agreed that Wartsila is entitled to arbitrate this warranty claim. Pl.'s Mem. [18], at 5. VTHM stated that it did "not oppose the motion to stay the warranty claim pending arbitration." *Id.,* at 1. It still maintains that "[t]he breach of warranty claim is separate and distinct, has no bearing on the tortious interference with contract claim, and it is conceded that that claim is subject to arbitration." Pl.'s Resp. [41] at 21.

9 U.S.C. § 3 provides that

[i]f any suit or proceeding be brought in any of the courts of the United States upon *any issue* referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties *stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

In light of Wartsila's Renewed Motion [37], and because the breach of warranty claim is referable to arbitration, the Court will stay the trial of this action until arbitration of that claim has been completed. *See* 9 U.S.C. § 3. Even assuming § 3 were not applicable, in the interest of judicial economy the Court finds that resolution of the tortious interference claim should be stayed pending outcome of the arbitration. Finally, to the extent the Court has not addressed any of the parties' arguments, it has nevertheless considered them and determined that they would not alter the result.

### III. <u>CONCLUSION</u>

After considering the record and evidence on file, as well as applicable law, and for the reasons more fully stated herein, the Court finds that Wartsila's Renewed Motion to Compel Arbitration [37] should be denied in part to the extent it seeks to compel arbitration of VTHM's tortious interference with contract claim. The Motion [37] should be granted in part as unopposed to the extent it seeks to compel arbitration of VTHM's breach of warranty claim. This matter will be stayed pending completion of arbitration of the warranty claim.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Renewed Motion to Compel Arbitration [37] filed by Defendant Wartsila North America, Inc., is **GRANTED IN PART and DENIED IN PART** as delineated herein, and the parties are ordered to submit Plaintiff VT Halter Marine, Inc.'s breach of warranty claim to arbitration.

21

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this matter is **STAYED** pending arbitration of Plaintiff VT Halter Marine, Inc.'s breach of warranty claim, and the Clerk of Court is directed to close this case for statistical purposes and place it on the inactive docket of this Court.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the parties shall move to lift the stay and reinstate this case on the active docket of this Court within 30 days after the conclusion of the arbitration.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, in the event that arbitration is not concluded within one year from the date of entry of this Order, Plaintiff VT Halter Marine, Inc., and Defendant Wartsila North America, Inc., shall file a status report with the Court every sixty (60) days until arbitration is concluded.

**SO ORDERED AND ADJUDGED**, this the 9th day of October, 2013.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE